# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-10-00012-CR

**Barbara Ann Wyatt, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM COUNTY COURT AT LAW NO. 3 OF WILLIAMSON COUNTY
### NO. 07-05096-3, HONORABLE DONALD HIGGINBOTHAM, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

A jury convicted Barbara Ann Wyatt of interference with public duties. *See* Tex. Penal Code Ann. § 38.15(a)(1) (West 2011). Tracking the statutory language, the charging instrument alleged that Wyatt

> did then and there while Officer [Rene] Alvarez, a peace officer, was performing a duty or exercising authority imposed or granted by law, to-wit: assisting Child Protective Services with conduction [of] an emergency child removal, with criminal negligence, interrupt, disrupt, impede, or interfere with the said Officer [Rene] Alvarez by taking control of a child being removed and trying to leave with the child.

*See* Tex. Fam. Code Ann. § 262.104(a) (West 2008) (authorizing emergency child removal). On appeal, Wyatt argues that the evidence was legally insufficient to support her conviction because it failed to show that she acted with criminal negligence. *See* Tex. Penal Code § 38.15(a)(1) (person must act with criminal negligence to commit offense of interference with public duties); *id*. § 6.03(d)

(West 2011) (defining "criminal negligence"). Additionally, Wyatt argues that (1) the trial court erred by granting the State's motion to quash a defense-witness subpoena; (2) the State engaged in prosecutorial misconduct by releasing a particular defense witness from appearing at trial; (3) the trial court erred by denying her motion for new trial; and (4) the trial court erred by improperly commenting on the weight of the evidence. For the following reasons, we affirm the conviction.

## FACTUAL AND PROCEDURAL BACKGROUND

On April 25, 2007, CPS caseworker Linsay Tomlinson, accompanied by Georgetown police detective Craig Murray, went to Wyatt's house to check on some of Wyatt's grandchildren—specifically, the children of Wyatt's daughter Brandi. CPS was investigating allegations that Brandi had abused her children. At the time, Wyatt, Brandi, Brandi's children, and Jocelyn Sedwick (another of Wyatt's daughters) all lived at Wyatt's house.

When Tomlinson and Murray arrived at the house, Brandi was not there. Tomlinson told Wyatt and Sedwick that she needed to speak with Brandi "as soon as possible" about a "serious matter," but she did not provide further details because of CPS's confidentiality policy. Tomlinson testified that Wyatt became agitated and said she did not know how to contact Brandi. At some point Wyatt called Brenda McDonald, her sister who lived nearby, and asked her to come over.

While Tomlinson, Detective Murray, and Wyatt continued talking in the front room of Wyatt's house, Sedwick slipped out the back door holding one of Brandi's children. Moments later, another CPS caseworker, Lauren Blondek, arrived at Wyatt's house, and as she pulled into the driveway she saw Sedwick crossing the street holding Brandi's child. Blondek made contact with Tomlinson and relayed what she had just seen. At about the same time, Brenda McDonald arrived

2

and told Wyatt to go pick up Brandi's oldest child from school. Wyatt subsequently drove away in McDonald's car.

Next, Blondek, Tomlinson, Murray, and McDonald all crossed the street to where Sedwick had gone. They quickly caught up with Sedwick and began speaking with her. Tomlinson testified that during this exchange McDonald was agitated and threatening. She also testified that based on the entire course of events, she "determined that the family was being uncooperative, and was being a bit secretive." As a result, after consulting her supervisor over the phone, she decided to "go ahead and remove the children" despite not having made contact with Brandi. Tomlinson informed Sedwick and McDonald of the decision to remove the children while the women were still standing across the street from Wyatt's house. Wyatt was not present.

The group that had gathered across the street from Wyatt's house subsequently went to McDonald's house to collect some of Brandi's children's belongings before CPS took the children into custody. When the group arrived at McDonald's house, several police officers, including Rene Alvarez, were already standing in the front yard. At some point, Sedwick handed Brandi's child to McDonald.

A short time later, Wyatt drove up in McDonald's car and parked it in McDonald's driveway. A videotape introduced into evidence shows that Wyatt exited the car hastily (without closing her door), walked directly to McDonald, grabbed the child from her arms, and started walking back towards the car. As she did so, Officer Alvarez intercepted her and pinned her against the wall of McDonald's house. Alvarez testified that before he did so he heard Wyatt say to McDonald, "They ain't going anywhere with them. I'm taking them."

3

After Alvarez pinned Wyatt against the wall of McDonald's house, McDonald approached the struggling pair and tried to wrest the child from Wyatt's arms. Alvarez pushed McDonald away repeatedly, and Wyatt struggled against Alvarez's grasp. Eventually, Wyatt stopped struggling, Alvarez let go of her, and Wyatt handed the child to McDonald. The evidence is undisputed that until that point, no one had directly informed Wyatt that CPS had decided to remove the children.

Alvarez did not arrest Wyatt on the scene; rather, he decided to arrest her some time later after discussing the incident with his supervisor. The State charged Wyatt with interference with public duties, alleging that Wyatt had interfered with Alvarez's attempt to assist with the child removal "by taking control of a child being removed and trying to leave [the scene] with the child." Wyatt pleaded not guilty.

Before trial, Wyatt subpoenaed several people who were employed by the Georgetown Police Department and the Georgetown School District. The State moved to quash the subpoenas, and the court granted the State's motion as to several of the witnesses on the basis that their testimony would have been irrelevant because it pertained to CPS's investigation of Brandi rather than the events underlying Wyatt's prosecution. The court did not, however, grant the State's motion to quash the subpoena of Georgetown Police Officer Todd Terbush, who had accompanied CPS on a visit to Wyatt's home approximately ten days before the events in question and had also approved Alvarez's written report of the events.

During trial, the State called CPS caseworkers Tomlinson and Blondek as witnesses. It also called Detective Murray, Officer Alvarez, and a couple of other police officers who were

present at McDonald's house during the events in question. Wyatt called only Sedwick and McDonald as witnesses. The jury ultimately found Wyatt guilty, and punishment was assessed at 120 days in jail and a $500 fine. Wyatt appeals.

## DISCUSSION

Wyatt makes five arguments on appeal:

1. The evidence was legally insufficient to support her conviction because it failed to show that she acted with the requisite mental state.

2. The trial court erred by quashing the subpoena of Alma Guzman, who was the principal of the school that Brandi's oldest child attended, because Guzman's testimony would have been material and favorable to the defense.

3. The State engaged in prosecutorial misconduct by releasing officer Todd Terbush from appearing at trial despite the fact that Wyatt had properly subpoenaed him.

4. The trial court erred by denying her motion for new trial after she was convicted.

5. The trial court erred by improperly commenting on the weight of the evidence during trial.

We will address these arguments in turn.

### *Issue Number One: Sufficiency of the Evidence*

Wyatt argues that the evidence was legally insufficient to support her conviction because it did not establish beyond a reasonable doubt that she acted with criminal negligence. *See id*. § 38.15(a)(1) (person must act with criminal negligence to commit offense of interference with public duties). Specifically, she argues that the evidence was insufficient to establish that she knew

5

why Officer Alvarez was on the scene, as she had not been on the scene when CPS decided to remove her grandchildren and no one informed her of CPS's decision before she tried to carry one of them away. Therefore, she argues, she could not be guilty of interfering with Officer Alvarez's attempt to assist CPS in removing her grandchildren.

### *Standard of Review*

When an appellant challenges the legal sufficiency of the evidence supporting a conviction, we ask whether, considering all of the evidence in the light most favorable to the verdict, the jury was rationally justified in finding guilt beyond a reasonable doubt. *Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010).

### *Discussion*

Given the issue that is presented, we must determine whether the evidence adduced at trial, considered in the light most favorable to the verdict, rationally justified the jury's finding that Wyatt negligently interfered with Officer Alvarez's performance of his duties. *See id.*

> A person acts with criminal negligence, or is criminally negligent, with respect to circumstances surrounding his conduct or the result of his conduct when he ought to be aware of a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint.

Tex. Penal Code Ann. § 6.03(d). The charging instrument alleged that Wyatt did "with criminal negligence, interrupt, disrupt, impede, or interfere with" Officer Alvarez's performance of an official

6

duty "by taking control of a child being removed and trying to leave with the child." Thus, in light of the standard just recited, we must determine (1) whether Wyatt ought to have been aware that her actions created a substantial and unjustifiable risk of impeding Officer Alvarez's performance of an official duty, and, if so, (2) whether Wyatt's failure to perceive that risk was a gross deviation from the standard of care that an ordinary person would have exercised under the circumstances as viewed from Wyatt's standpoint. *See id.*

Wyatt argues that the evidence was legally insufficient to establish her criminal negligence because "at no point [before she took the child from McDonald's arms] was [she] informed that CPS would be removing the children." Rather, she argues, "it was . . . uncontroverted that [she] left the scene and was not present at the time that the CPS workers made the determination that they would be removing the children." She argues that even after she arrived at McDonald's house, took the child from McDonald's arms, and began to walk away, neither CPS nor the police ever indicated any opposition to her actions until Officer Alvarez physically intercepted her.

To support her argument that she did not act with criminal negligence, Wyatt cites several cases in which defendants were held to have interfered with public duties because they repeatedly ignored instructions from police officers. *See, e.g.*, *Barnes v. State*, 206 S.W.3d 601, 605-06 (Tex. Crim. App. 2006) (defendant's failure to comply with officer's instructions provided legally sufficient evidence to support conviction for interference with public duties); *Boyd v. State*, 217 S.W.3d 37, 42-43 (Tex. App.—Eastland 2006, pet. ref'd) (same); *Berrett v. State*, 152 S.W.3d 600, 604-05 (Tex. App.—Houston [1st Dist.] 2004, pet. ref'd) (same); *Key v. State*, 88 S.W.3d. 672, 676 (Tex. App.—Tyler 2002, pet. ref'd) (same). Wyatt attempts to derive a general rule from these cases

7

that to establish the elements of interference with public duties, including the mental-state element of criminal negligence, a defendant must disobey police instructions. None of these cases explicitly states such a rule, however, and neither does the statute defining interference with public duties. *See* Tex. Penal Code § 38.15(a)(1). Rather, the only relevant question is whether, given the circumstances, Wyatt should have reasonably known that carrying off her grandchild created a substantial and unjustifiable risk of interfering with Officer Alvarez's execution of public duties. *See id.* § 6.03(d).

Although Wyatt's criminal negligence may not have been as stark as that of a defendant who repeatedly disobeys a police officer's orders, we hold that, viewing the evidence in the light most favorable to the verdict, there was legally sufficient evidence to support the jury's finding that Wyatt acted with criminal negligence. First, CPS investigator Lauren Blondek testified that during the "struggle to get the child back," Wyatt "was asked to give the child back either by [Blondek] or by law enforcement, and she didn't at first." Thus, Wyatt's contention to the contrary, there was evidence that Wyatt actually disobeyed a public official's instructions. Second, Officer Alvarez testified that before Wyatt grabbed her grandchild, he heard her say to her sister, "They ain't going anywhere with them. I'm taking them." This testimony constituted evidence that Wyatt affirmatively knew CPS intended to remove her grandchildren.

Even if there had been no such evidence, however, Wyatt admits that CPS initially told her it had come to check on her grandchildren because it was investigating a "serious matter," and when Wyatt arrived at McDonald's house she saw several police officers in the front yard alongside CPS investigators. Under such circumstances, it would be unreasonable not to infer that, at a minimum, the officers (including Officer Alvarez) might be assisting CPS. Viewed in the light

8

most favorable to the verdict, Wyatt's failure to perceive that removing her grandchild might interfere with the police's execution of their duties constitutes "a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint." *See id*. We overrule Wyatt's first issue.

### Issue Number Two:  Quashing the Subpoena of Alma Guzman

Next, Wyatt argues that the trial court erred by quashing her subpoena of Alma Guzman, who was the principal at the school that Brandi's oldest child attended.

#### Standard of Review

We review the quashing of a subpoena for abuse of discretion. *See Drew v. State*, 743 S.W.2d 207, 225 n.11 (Tex. Crim. App. 1987). A trial court abuses its discretion in quashing a subpoena if the defendant makes a plausible showing that the witness's testimony would be both material and favorable to the defense. *See Coleman v. State*, 966 S.W.2d 525, 527-28 (Tex. Crim. App. 1998). In this context, "material" means "relevant and important, and not merely cumulative." *Id*. at 527.

#### Discussion

Wyatt contends that Guzman would have testified that Wyatt went to her granddaughter's school on the day in question. Wyatt argues that this testimony would have been "both material and favorable to the defense because it would have confirmed that [Wyatt] was not present at the scene when CPS made the decision and notified the other family members that the

9

children would be removed." Confirming this fact, Wyatt argues, would have supported her argument that she did not act with criminal negligence, as it would have suggested that when she attempted to leave McDonald's house with one of her grandchildren she was unaware that CPS intended to remove the children. Wyatt also argues that the omission of Guzman's testimony undermines confidence in the jury's verdict because "without the omitted testimony [Wyatt's] whereabouts were unaccounted for and the jury could infer that [Wyatt] was still present in one of the homes and had not, in fact, left the scene entirely."

We agree with Wyatt that Guzman's testimony would have been favorable to the extent that it would have confirmed Wyatt's absence from the scene at the time when CPS announced its decision to remove the children. Guzman's testimony would not, however, have been material, because the evidence was undisputed that Wyatt was absent from scene; hence, her absence did not need to be proved. *See Miller v. State*, 36 S.W.3d 503, 507 (Tex. Crim. App. 2001) ("For evidence to be material it must be shown to be addressed to the *proof* of a material proposition.") (emphasis added) (internal quotation marks omitted). Put another way, when a matter is uncontested (like Wyatt's temporary absence), further evidence on the matter is merely cumulative and may properly be excluded. *See* Tex. R. Evid. 403; *see also Coleman*, 966 S.W.2d at 527 (in determining whether trial court erred by quashing subpoena, witness's testimony would not have been "material" if it would have been "merely cumulative"). We therefore conclude that the trial court did not abuse its discretion by quashing Wyatt's subpoena of Alma Guzman, as the court could have reasonably concluded that Guzman's testimony would have merely confirmed a fact that was not in dispute. We overrule Wyatt's second issue.

10

***Issue Number Three:  Releasing Officer Terbush from Testifying***

Next, Wyatt argues that the State committed prosecutorial misconduct by releasing Georgetown Police Officer Todd Tebush from testifying even though Wyatt had subpoenaed him as a witness.

***Standard of Review***

We review claims of prosecutorial misconduct on a case-by-case basis. *Stahl v. State*, 749 S.W.2d 826, 830 (Tex. Crim. App. 1988).  Our review is not limited to the facts of the case but also includes the probable effect on the jurors' minds.  *Hodge v. State*, 488 S.W.2d 779, 781-82 (Tex. Crim. App. 1973).  In determining whether a particular instance of misconduct represents reversible error, we may consider the following factors (among others):  (1) whether the defendant objected to the conduct of the prosecutor; (2) whether the prosecutors deliberately violated an express court order; and (3) whether the prosecutor's misconduct was so blatant as to border on being contumacious.  *See Stahl*, 749 S.W.2d at 831.  If we determine that prosecutorial misconduct has occurred, we will reverse unless the misconduct was harmless beyond a reasonable doubt.  *Id*. at 832.

***Discussion***

Terbush conducted a CPS welfare check at Wyatt's house approximately ten days before the events in question, and Wyatt claims that Terbush would have testified that the conditions at her house during that visit were not harmful to her grandchildren.  On the second day of trial, the State represented that Terbush was available to testify should Wyatt call him.  She did not end up

11

doing so. During a subsequent hearing on Wyatt's motion for new trial, Terbush testified that the prosecutors knew he was out of town during the week of trial and told him he would not need to appear. Thus, Wyatt argues, the State committed prosecutorial misconduct by "excusing" Terbush from appearing even though Wyatt had properly subpoenaed him.

We reject this argument for several reasons. First, Wyatt did not complain of prosecutorial misconduct during trial. She therefore did not preserve error. *See Hajjar v. State*, 176 S.W.3d 554, 566 (Tex. App.—Houston [1st Dist.] 2004, pet. ref'd) (prosecutorial misconduct is independent basis for objection that must be specifically urged to preserve error).[1] Second, Wyatt did not even attempt to call Terbush as a witness during trial. Thus, even if the State's actions can be characterized as "misconduct," they were harmless. *See Stahl*, 749 S.W.2d at 832. Finally, even if Wyatt *had* attempted to call Terbush as a witness, his testimony would have been irrelevant; it pertained to the conditions at Wyatt's house roughly ten days before the events in question, not to Wyatt's conduct during the events in question. In fact, at the hearing on Wyatt's motion for new trial, Terbush explicitly stated that he had no personal knowledge of the events in question. In light of these factors, we hold that even if the State's actions could be characterized as "misconduct," they were harmless beyond a reasonable doubt. We overrule Wyatt's third point of error.

*Issue Number Four: Denial of the Motion for New Trial*

Next, Wyatt argues that the trial court erred by overruling her motion for new trial.

---

[1] Wyatt appears to claim that she did not object to the alleged prosecutorial misconduct during trial because she did not learn of it until Terbush testified at the hearing on the motion for new trial. Even if that is the case, however, Wyatt still did not raise the issue of prosecutorial misconduct during that hearing, instead raising it for the first time in her appellate brief.

12

### *Standard of Review*

We review a trial judge's ruling on a motion for new trial for abuse of discretion. *Charles v. State*, 146 S.W.3d 204, 208 (Tex. Crim. App. 2004). We do not substitute our judgment for the trial court's, but rather decide whether the trial court's decision was arbitrary or unreasonable. *Id*. We view the evidence in the light most favorable to the trial court's ruling and presume that all reasonable factual findings that could have been made against the losing party were made against the losing party. *Id*. We will not reverse an order overruling a motion for new trial unless "no reasonable view of the record could support the trial court's ruling." *Id*.

### *Discussion*

Wyatt's motion for new trial advanced three bases of error: the purported legal insufficiency of the evidence, the quashing of the subpoena of Alma Guzman, and the quashing of the subpoenas of three Georgetown police officers. We have already explained why the first two arguments lack merit, so here we address only the third.

During the punishment phase of trial, the State adduced evidence that Wyatt had prior criminal convictions. Wyatt argues that the subpoenaed officers' testimony would have mitigated the effects of the prior-conviction evidence because the officers' testimony would have shown that Wyatt had also had "positive interactions" with law-enforcement officials. Wyatt notes that the sentence she received (120 days in jail and a $500 fine) was not the minimum allowed by law, so there is a reasonable probability that the jury would have assessed a lower sentence if it had heard the officers' testimony.

13

We reject this argument because during the hearing on Wyatt's motion for new trial, the officers all testified that they had previously had both positive *and* negative interactions with Wyatt.[2] Given this fact, the trial court could reasonably conclude that, on the whole, the officers' testimony would not have mitigated evidence showing that Wyatt had prior convictions. Because it was reasonable for the trial court to conclude that quashing the officers' subpoenas was not a basis for granting the motion for new trial, we must affirm its ruling. *See Charles*, 146 S.W.3d at 208. We overrule Wyatt's fourth point of error.

### Issue Number Five:  Comment on the Weight of the Evidence

Finally, Wyatt argues that the trial court committed reversible error by improperly commenting on the weight of the evidence during trial.

#### Standard of Review

A trial judge should not comment on the weight of the evidence.  Tex. Crim. Proc. Code Ann. art. 38.05 (West 1979).  To constitute reversible error, a trial court's comment on the weight of the evidence "must be such that it is reasonably calculated to benefit the State or to prejudice the rights of the defendant." *Becknell v. State*, 720 S.W.2d 526, 531 (Tex. Crim. App. 1986). This occurs when the court "makes a statement that implies approval of the State's argument, that

---

[2] The first officer testified that "We have had incidents where emotions were very elevated of which [sic] it was very difficult to communicate on both ends of the spectrum.  At other times I've met with Barbara, it's just been in a social setting, and we've gotten along and communicated wonderfully."  Similarly, the second officer testified that his interactions with Wyatt had "cover[ed] the full spectrum from very pleasant to having to make a physical arrest on her."  Finally, the third officer testified that "Through the years, we've had a number of incidences where there's been a lot of emotion on both sides . . . . I think anytime that the police department is called and interacts with her . . . , it is automatically a conflict.  So, it always turns into a very high stressed shouting match."

indicates any disbelief in the defense's position, or that diminishes the credibility of the defense's approach to its case." *Watts v. State*, 140 S.W.3d 860, 863 (Tex. App.—Houston [14th Dist.] 2004, pet. ref'd).

### *Discussion*

Wyatt claims that the trial court made two improper comments on the weight of the evidence. The first comment occurred when, during trial and in the jury's presence, defense counsel attempted to question CPS caseworker Tomlinson about CPS's investigation of Brandi. Previously, before trial and outside the jury's presence, the court had instructed the parties to avoid getting into details of the investigation because they were irrelevant to the charge at issue. Thus, when defense counsel attempted to question Tomlinson about the investigation, the court responded by saying, "I thought we have been through that, been through that, and been through that in the pretrial. Do you want to take it into this C.P.S. investigation, Counsel? Do you want to open that door?"

The second contested comment occurred during defense counsel's direct examination of McDonald. McDonald began giving a narrative answer that veered away from the question she had been asked, and the State objected to her answer on the basis that it was nonresponsive. The court responded, "Well, the first thing we're going to do is do question and answer instead of long diatribe."

Wyatt argues that the first contested comment "inform[ed] the jury that the court had previously found the defensive theories and arguments of the defense to be without merit," thereby "indicat[ing] [the court's] disbelief in the defense's position and/or diminish[ing] the credibility of

15

the defense's approach to the case in the eyes of the jury." Wyatt argues that the second contested comment revealed a negative view of McDonald's testimony in characterizing it as "diatribe."

Wyatt admits that she did not object to either comment during trial. This means that Wyatt failed to preserve error. *See* Tex. R. App. P. 33.1(a); *Peavey v. State*, 248 S.W.3d 455, 470 (Tex. App.—Austin 2008, pet. ref'd). Wyatt concedes the point but argues that the trial court's comments represented fundamental error that did not require objection. *See* Tex. R. Evid. 103(d) (in criminal case, appellate court may note fundamental errors that were not raised in trial court); *see also Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984) (fundamental error is error so egregious that it deprives defendant of right to fair trial).

To support her fundamental-error argument, Wyatt cites *Blue v. State*, 41 S.W.3d 129 (Tex. Crim. App. 2000). In *Blue*, the trial court told the venire that the defendant had attempted to strike a plea bargain with the State and that the trial court wished the defendant had pleaded guilty. *Id*. at 132-33. A plurality of the court of criminal appeals held that the trial court's statements tainted the presumption of innocence, constituting fundamental error and therefore requiring no objection to preserve error. *Id*.

The plurality opinion in *Blue* is not binding precedent, *see Jasper v. State*, 61 S.W.3d 413, 421 (Tex. Crim. App. 2001), but even if it were, the trial court's comments in this case did not rise to the level of those in *Blue*. The comments in *Blue* touched upon the core issue of a defendant's guilt or innocence. *See Blue*, 41 S.W.3d at 132 ("A juror who hears the judge say that he would have preferred that the defendant plead guilty might assume that the judge knows something about the guilt of the defendant that the juror does not. Surely, no trial judge would want an innocent man

16

to plead guilty, no matter how much delay and expense he might be causing."). Here, in contrast, the trial court's comments suggested only that (1) defense counsel was attempting to broach a subject that the court had previously and repeatedly instructed the parties to avoid and (2) the court believed a defense witness's testimony was a "diatribe." Wyatt cites no authority suggesting that such statements represent fundamental error, and significant authority suggests that they do not; Texas courts have indicated that improper comments may represent fundamental error when they taint the presumption of innocence or undermine the impartiality of the jury. *See, e.g., Jasper*, 61 S.W.3d at 421 (holding that even under reasoning of *Blue*, trial judge's comments would not rise to level of fundamental error because they lacked elements that would taint presumption of innocence or prejudice jury); *Ganther v. State*, 187 S.W.3d 641, 650-51 (Tex. App.—Houston [14th Dist.] 2006, pet. ref'd) (concluding that even if court of appeals were bound by *Blue* plurality, trial judge's comments did not rise to level of tainting presumption of innocence or vitiating impartiality of jury).

Wyatt would have us conclude that the trial court's comments *did* undermine the impartiality of the jury by indicating that the court had a negative view of Wyatt's case. We disagree. A comment that indicates defense counsel is broaching a topic previously placed off-limits simply does not suggest that the court has a negative view of a defensive theory. Nor does a comment characterizing a defense witness's testimony as a "diatribe"; indeed, Wyatt admits that even though "diatribe" is often use pejoratively, the word also has a neutral definition. *See* Webster's Third New Int'l Dictionary 625 (2002) (defining "diatribe" as "a prolonged discourse or discussion").

17

In sum, we conclude that the contested comments do not rise to the level of fundamental error. *See Jasper*, 61 S.W.3d at 421; *Ganther*, 187 S.W.3d at 650-51. Because Wyatt did not object to the trial court's comments and because the alleged error was not fundamental, Wyatt's complaint is waived. *See id*. We overrule Wyatt's fifth point of error.

## CONCLUSION

For the reasons stated above, we affirm the conviction.

_____

David Puryear, Justice

Before Justices Puryear, Rose and Goodwin

Affirmed

Filed:   February 16, 2012

Do Not Publish

18